UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| TERESA YOUNG | * | CIVIL ACTION NO. 16-2834 |
| | * | |
| VERSUS | * | SECTION: "F"(1) |
| | * | |
| CAROLYN W. COLVIN, ACTING | * | JUDGE MARTIN L. C. FELDMAN |
| COMMISSIONER OF THE SOCIAL | * | |
| SECURITY ADMINISTRATION | * | MAGISTRATE JUDGE |
| | * | JANIS VAN MEERVELD |
| ************************************ | * | |

REPORT AND RECOMMENDATION

The plaintiff, Teresa Young, seeks judicial review, pursuant to Section 405(g) of the Social Security Act (the "Act"), of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying her claim for disability insurance benefits ("DIB") under Title II of the Act, 42 U.S.C. § 1381. The matter has been fully briefed on cross-motions for summary judgment. For the following reasons, IT IS RECOMMENDED that the Motion for Summary Judgment filed by the plaintiff (Rec. Doc. 12) be DENIED; and the Motion for Summary Judgment filed by the Commissioner (Rec. Doc. 13) be GRANTED.

**Procedural Background**

Ms. Young applied for DIB on April 16, 2013, asserting a disability onset date of October 15, 2005. R. at 54. She alleged the following illnesses, injuries or conditions: fibromyalgia, depression, arthritis, carpal tunnel, left shoulder, osteoporosis, IC, intercostal neuropathy, migraines, and diverticulitis. Id. On November 20, 2013, her claim was denied by the state agency. R. at 53. Ms. Young requested reconsideration. R. at 77. In addition to the sources considered with the original claim, the state agency considered the January 6, 2014, submission by Dr. Robert Wiemer Jr. R. at 80. The request for reconsideration was denied. R. at 62-70, 80.

Ms. Young requested a hearing before an Administrative Law Judge ("ALJ"), which was held on October 16, 2015. R. at 29. At the hearing, Ms. Young's counsel requested that her disability onset date be amended to May 15, 2011, a date that conforms to Ms. Young's 55th birthday. R. at 32. The ALJ granted the motion. Id. On October 21, 2015, the ALJ issued an adverse decision. R. at 12-28. The Appeals Council denied review on February 3, 2015. R at 1-3.

On April 5, 2016, Ms. Young filed a Complaint in federal court to review the Commissioner's decision. (Rec. Doc. 1). The Commissioner answered and filed the administrative record. (Rec. Docs. 8, 9). The parties filed cross-motions for summary judgment. (Rec. Docs. 12, 13). Ms. Young has been represented by counsel since April 2013, through her request for reconsideration, her hearing before the ALJ, her appeal to the Appeals Council and the present lawsuit. R. at 29, 71.

## Evidence in the Record

At the administrative hearing, Ms. Young testified that she had worked as an over-the-road truck driver in the late 1990s. R. at 35. This job required that she carry weights of up to 100 pounds. Id. After leaving this position, she worked as a server in a restaurant. Id. As a server, she was on her feet all day and regularly carried trays of food or dishes weighing as much as 25 or 50 pounds. R. at 35-36.

She testified that in the early 2000s, she sustained an injury to her left shoulder in the course of working. R. at 36. She said she had two shoulder surgeries in 2004. Id. Her medical records from this time period indicate that she visited Dr. Lawrence Line, Jr., with Southern Bone & Joint Specialists, P.A., on March 5, 2002. R. at 183. She informed Dr. Line that she was injured on June 6, 2001, when she fell and caught herself with her left arm. Id. She complained of pain in the upper scapular area of the left shoulder and intermittent numbness in the arm. Id. Dr. Line reported

that Ms. Young had nearly full range of motion of the shoulder with no real pain related to the shoulder, but that she complained more of the levator and trapezius area on examination. Id. He noted some decreased range of motion of the neck with pain when turning to the affected side. Id. Dr. Line diagnosed Ms. Young with left levator syndrome and recommended physical therapy twice a week. Id. He also recommended that she continue working five hours a day for five days a week. Id. He told her that that "this is something that should improve just with time and requires just appropriate physical therapy." Id. He ordered an MRI of the cervical spine to rule out any associated herniated disc or other reasons causing numbness. Id.

On March 12, 2002, an MRI of the cervical spine was performed by radiologist Dr. Scott Keeler. R. at 179.Dr. Keeler found multi-level degenerative change at C5-C6 and C6-C7. Id. At C5-C6, he noted loss of disc height and disc signal, anterior and posterior osteophyte formation, and a small central disc herniation. Id. He explained that it does not appear to affect the neural foramina and the central and neural foramina appeared to be widely patent. Id. At C6-C7, he noted loss of disc height and disc signal and mild concentric disc bulging. Id. He explained that this did not appear to cause significant encroachment upon the thecal sac or neural foramina. Id. Remaining disc levels were noted as unremarkable. Id.

On April 2, 2002, Ms. Young had a follow up appointment with Dr. Line. R. at 182. He noted she had only attended three therapy appointments because the treatment had only recently been approved by Worker's Compensation. Id. He also noted that Ms. Young was still complaining of the same symptoms in her levator and up into her neck and that she was having tension headaches. Id. He reported that "MRI of her C-spine is completed and shows no evidence of any herniated disc or obvious cervical problem." Id.

A physical therapy progress note by Crosby Memorial Hospital dated April 2, 2002, confirms that Ms. Young had attended three physical therapy appointments. R. at 188. The physical therapist recommended continued treatment. Id. A physical therapy progress note from Crosby Memorial Hospital dated May 8, 2002, indicates that Ms. Young had eight additional physical therapy appointments and that her progress had plateaued. R. at 187. There is no evidence of other physical therapy in the record.

Other than her testimony, there is no direct evidence in the record of shoulder surgeries in 2004. As discussed further below, a 2011 MRI of the left shoulder indicates evidence of an acromioplasty and posterior labrum and glenoid repair. R. at 181.

Ms. Young testified that she filed a worker's compensation claim related to her 2001 shoulder injury and it was determined that she could no longer work as a server. R. at 37. In connection with this worker's compensation claim, the record contains a functional capacity evaluation performed by occupational therapist Barry Fitterer and physical therapist Sidney Borne of Healthsouth on September 7, 2006. R. at 295. They noted a diagnosis of left shoulder pain. Id. They concluded that Ms. Young demonstrated the capacity to perform light demand work for an 8 hour day, which means exerting up to 20 pounds of force occasionally and/or up to 10 pounds of force frequently. Id. They determined that she would be unable to perform work as a server because a server is a "medium demand" occupation requiring exerting 20 to 50 pounds of force occasionally and 10-25 pounds of force frequently. Id. They concluded that Ms. Young could meet the requirements of a hostess, which was her current work. Id. Ms. Young testified that following this injury, she continued working as a hostess at Cracker Barrel, where she had worked as a server. R. at 36. Consistent with this testimony, the job history in her disability report indicates she worked as a server six days a week, eight hours a day until June 2001, at which time she began

working as a hostess one day a week for five hours. R. at 112, 122. However, as noted above, her report to Dr. Line in 2002 indicated that at that time she was working as a hostess five days a week. R. at 183.

Ms. Young testified that she had a fusion operation performed on her neck in 2011. R. at 38. Before the neck surgery, she experienced pain and numbness in her arms and hands. R. at 39. She testified that after the surgery, the numbness was not as severe at night but she still experiences numbness if she drives more than an hour or hour and a half. Id.

Ms. Young's medical records indicate that an MRI of the cervical spine was performed on September 21, 2011, as a result of complaints of left shoulder pain, neck pain and numbness in bilateral hands. R. at 180. The impression was noted as "degenerative disc changes, most prominent at C5-6 where there is moderate to severe right and moderate left foraminal stenosis." R. at 180. An MRI of the left shoulder was also performed. The impression was noted as "post-surgical changes from prior acromioplasty and posterior labrum and glenoid repair. No evidence for rotator cuff tear." R. at 181.

Ms. Young visited Dr. Michael C. Patterson with Southern Bone & Joint Specialists on October 12, 2011, complaining of neck pain, bilateral shoulder pain and left sided arm pain. R. at 173. Ms. Young told Dr. Patterson the problems had been persistent for quite a while. Id. Other than the noted problems, Dr. Patterson noted her musculoskeletal system was normal. R. at 174. Ms. Young also reported headaches and migraines. R. at 174. Dr. Patterson noted that the "X-rays and MRI show degeneration and disc space collapse with modic endplate changes surrounding the C5-C6 disc." R. at 174. He also observed foraminal stenosis at C5-C6 "and to some extent at C6-C7." R. at 174. He determined she had long-standing cervical radicular syndrome with associated disc space collapse and stenosis. R. at 175.

On November 17, 2011, Dr. Patterson performed an anterior cervical discectomy with decompression and an anterior fusion on C5-C6 and C6-C7. R. at 184; <u>see</u> Pathology Report, R. at 178. A Medtronic venture plate and screws and a cornerstone allograft were implanted. R. at 184.

During Ms. Young's postoperative evaluation with Dr. Patterson on December 8, 2011, he reported that "[s]he has the usual postoperative neck discomfort. We will treat this with standard therapy." R. at 170. Dr. Patterson noted a diagnosis of cervical disc displacement and indicated a follow up visit in three months. R. at 171. She was prescribed Celebrex to take as needed. R. at 171.

Ms. Young's medical records indicate she began visiting Dr. Wiemer with the Gulf Functional Medical Institute in January 2012 with complaints of pain in the low back, thoracic spine, left shoulder, and neck as well as migraines. R. at 284-85. Records before the ALJ showed that she continued visiting monthly (or every four weeks) through December 2013. R. at 211-83. She was prescribed oxycodone, Soma, Xanax, Lortab and Fioricet. <u>Id.</u> Except for her October 2013 and March 2013 visits, Ms. Young reported that her current pain medication was effective at every visit. <u>Id.</u> She typically reported her pain was stable or controlled and at a level of 3, 4 or 5 on a scale of 1 to 10. <u>Id.</u> In July 2013 she reported pain at a level of 6 with increased pain in the left leg. R. at 227. In February 2013 she reported a pain level of 7 and in March 2013 she reported increased pain in her low back with pain at level 6. R. at 243-241. Although reporting a pain level of 4, from July 2012 through September 2012, she reported increased low back pain. R. at 259, 262, 265. At most of the visits, it was noted that her pain had not resulted in marked difficulties in ability to maintain attention and concentration. R. at 213, 218, 221, 224, 230, 232, 235, 238, 245, 249, 252, 255, 259, 262, 269, 275, 279, 281. At six visits, this question was not answered. R. at

227, 241, 243, 265, 267, 272. The question was never marked to indicate that the pain caused marked difficulties in ability to maintain attention and concentration.

In connection with her application for DIB, the Office of Disability Determination Services authorized x-rays of Ms. Young's shoulder and lumbar spine from Singing River Hospital. R. at 195. The x-rays were performed on August 21, 2013. R. at 196. For the left shoulder x-ray images, Dr. James Moore Carter provided the impression "No significant abnormality noted." Id.  He also reviewed 2 lumbar spine x-ray images and reported "Normal lumbar spine series." R. at 199.

Dr. Harold Coulter of Midway Family Care performed a consultative examination on August 23, 2013. R. at 203. Dr. Coulter quoted Ms. Young's chief complaint as "I'm applying for disability because it kills me to work one day a week." R. at 203. He noted her past medical history as "significant for fibromyalgia." Id.  He reported that she walked into the examination room without assistance or the use of an assistive device, she was able to get on and off the exam table and could take her shoes off and put them back on. R. at 204. He reported "[a]ll range of motion measurements were within normal limits." R. at 205. He reported that on physical examination there was no evidence of a positive Tinel's or Phalen's sign or other relative testing. Id.  Her strength was 5/5 upper extremity compared to lower extremity and right compared to left. Id.  Her grip strength bilaterally was 5/5. Id.  He noted no weakness or atrophy. Id.  He provided "no objective medical diagnosis." Id.  He reported "from my assessment of this claimant I do not feel the conditions will impose any limitations for the next twelve continuous months as there are no obvious objective limitations on this exam." R. at 205-06.

State Agency reviewing physician Dr. Louis Saddler completed a Disability Determination Explanation on September 29, 2013. R. at 60. Dr. Saddler reviewed Ms. Young's medical records, including Dr. Coulter's report, records provided by Dr. Weimer on July 11, 2013, records provided

by Southern Bone & Joint Specialists, as well as Ms. Young's functional report and work history. R. at 57-58. He provided a diagnosis of fibromyalgia and affective disorders. R. at 58. He noted that he considered listing 1.02 for major joint dysfunction. Id. Dr. Saddler determined that Ms. Young had the residual functional capacity to lift 50 pounds occasionally and 25 pounds frequently, that she could stand or walk for six hours in an eight-hour work day, and that she could sit for a total of six hours in an eight-hour work day. R. at 59. Dr. Saddler determined Ms. Young was not disabled. R. at 60.

On October 31, 2013, Patsy H. Zakaras, Ph.D. performed a comprehensive mental status evaluation to assess Ms. Young's allegation of depression. R. at 207-08. Dr. Zakaras diagnosed adjustment disorder with depressed mood. R. at 209. She found that Ms. Young's problems "appear to be mostly physical." Id. She concluded that Ms. Young appears capable of performing routine repetitive tasks, following and understanding directions, relating to others, and interacting with others. R. at 209-10.

Dr. Weimer filled out a Disability Report Form on January 2, 2014. R. at 212. He diagnosed cervical spine pain, neuropathy, shoulder pain, thoracic pain, and lumbar pain, all in stable condition, with undetermined prognosis/duration. R. at 212.

State Agency reviewing physician Dr. Robert Culpepper completed a Disability Determination Explanation upon reconsideration of Ms. Young's claim. R. at 63-70. Additional evidence on reconsideration included supplemental medical records provided by Dr. Weimer and received on January 6, 2014. R. at 64. Dr. Culpepper stated that he had "received and reviewed" the additional medical records and that "[o]n 12/11/2013 OV, cervical, thoracic and lumbar pain was stable as well as neuropathy and shoulder pain. Therefore, prior determination is affirmed as written." R. at 68.

In connection with her appeal to the Appeals Council, Ms. Young submitted additional records from the Gulf Functional Medical Institute reflecting monthly visits from January 2014 through April 2015. (Rec. Doc. 9-7, 129-187). Like the earlier records, Ms. Young typically reported pain levels of 4 or 5 (with reports of level 3 in January and March 2015). Id. She generally reported that her pain was stable or under control, with reports of increased pain at three visits. Id. At all but one visit (where no notation was included), it was noted that her current medications were effective, and except for three visits where no answer was provided, it was always reported that Ms. Young's pain did not result in marked difficulties in ability to maintain attention and concentration. Id.

At the time of the hearing Ms. Young testified that she was still working as a hostess at Cracker Barrel, once a week for five hours a day. R. at 37. She explained that she picks up high chairs and booster seats "and things that I'm really not supposed to be doing" according to the 2006 Worker's Compensation evaluation. Id. She testified that she had tried to work more than one day a week, "but there's no way I can do that." R. at 38. She explained that "after five, six hours that one day, I go home and my shoulder and my back is just killing me and I, you know, just lay around the next day even, you know, because I'm just so run down . . . ." Id. She testified that it takes her two days to get over five hours of work. R. at 42.

Ms. Young testified that she can walk about 50 or 75 feet. R. at 43. She said she could not be on her feet for long, but if she was steadily busy, she would start having problems once she got off of her feet. Id. She testified that on days she is not working, she will be on her feet for one and a half or two hours at most. R. at 44. She said she could not lift eight pounds with her just her left hand but that she could do so with just her right. R. at 44. She testified that when shopping for groceries, she could lift the bags but that she would not let them get too heavy for her. R. at 45.

She testified that she did not think she would be able to be up and walking around at a job for an eight-hour period because of pain in her legs and lower back. R. at 45-46.

When asked to describe her present complaints related to her neck, she indicated range of motion, headaches, pain that goes into her shoulder and clavicle, and numbness in her arms and hands. R. at 39-40. She also described her current low back problems as severe osteoporosis, with steady soreness in her lower back and pain that goes down the back of her left leg at all times. R. at 40. She testified that she had been in the care of a pain management physician since the surgery and visits him once a month. R. at 40. She takes oxycodone, a muscle relaxer, and anti-anxiety medication. R. at 40-41. She testified that the medication makes her drowsy and she cannot focus as well so she does not take any before work and works in pain. R. at 41. She said that over the last several years, she feels her condition is getting worse. Id. Ms. Young testified that her daily activities include watching television and playing with her pets. R. at 41.

Ms. Young said she had recently seen a mental health professional twice and had received a prescription for Prozac, which she had started taking about three weeks prior to the hearing. R. at 42. Other than Dr. Zakaras's consultative evaluation, there is no evidence in the record of Ms. Young visiting any mental health professionals.

Vocational expert Donald Woodall testified at the administrative hearing. R. at 46-50. The ALJ presented two hypotheticals. In both, Mr. Woodall was asked to consider a 59 year old with a GED and no past relevant work history. R. at 47. In the first hypothetical, the ALJ presented the following residual functional capacity: a person limited to the performance of medium-level work with additional limitations that the person never climb ladders, ropes or scaffolds and the person could occasionally climb ramps or stairs. Id. Mr. Woodall testified that this person could perform work as a kitchen helper (DOT 318.687-010, medium, unskilled, SVP 2), laundry worker (DOT

361.684-014, medium, unskilled, SVP 2) or hand packager (DOT 920.587-018, medium, unskilled, SVP 2). <u>Id.</u> He testified that in the national economy there were in excess of 80,000 kitchen helper jobs, 30,000 laundry worker jobs, and 40,000 hand packager jobs. <u>Id.</u> The ALJ asked if Mr. Woodall's testimony was consistent with the Dictionary of Occupational Titles ("DOT") and he said yes. <u>Id.</u>

In the second hypothetical, the ALJ asked Mr. Woodall to consider the following residual functional capacity for a person of Ms. Young's age, education, and past work history: ability to stand or walk for two hours during an eight hour work day, and sit for six hours in an eight-hour work day, limited to lifting and/or carrying no more than ten pounds, and the person should never climb ladders, ropes or scaffolds and could occasionally climb ramps or stairs. R. at 48. The person would require numerous, unscheduled rest breaks during the course of a normal, five-day, 40-hour work week and at least some of the breaks would be lengthy in duration. <u>Id.</u> Mr. Woodall testified there would be no unskilled jobs in the national economy that this person could perform. <u>Id.</u> The ALJ asked if Mr. Woodall's testimony was consistent with the DOT and he said yes. <u>Id.</u>

Ms. Young's counsel asked Mr. Woodall to consider a person with the same age, education and work history, as well as the following limitations: could not lift or carry more than 10 to 20 pounds, even on an occasional basis and, due the effects of residual pain, would be limited to standing and walking no more than four hours in an eight-hour day and would have moderate limitations on attention and concentration due to chronic pain and the effect of medication, resulting in the person being off task ten percent of the time. R. at 49. Mr. Woodall said there would not be jobs for such a person. <u>Id.</u> The vocational expert testified that if the "off task" limitation was removed, the person would be classified as working in a limited, light capacity. R. at 50.

## Decision of the Administrative Law Judge

The ALJ found that Ms. Young last met the insured status requirements of the Act on June 30, 2015. R. at 19. He found that she had not engaged in substantial gainful activity from the amended disability onset date of May 15, 2011, through her date last insured. Id. The ALJ found that through the date last insured of June 30, 2015, Ms. Young had the following "severe" impairments: "history of cervical disc disease with status post November 2011 cervical spine surgery; status post January and May 2004 left shoulder surgeries; a history of hypertension; complaints of fibromyalgia, complaints of headaches." Id. However, the ALJ concluded that through June 15, 2015, Ms. Young did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404 Subpart P, Appendix 1. In making this conclusion, the ALJ explained that he gave significant weight to the opinions of the State Agency reviewing physicians. Id.

The ALJ found that through the date last insured, Ms. Young had the residual functional capacity to perform medium work as defined in 20 C.F.R. § 404.1567 except with no climbing of ladders, ropes or scaffolds and occasional climbing of ramps or stairs. R. at 19-20. In making this finding, the ALJ determined that "[t]he objective medical evidence does not support the claimant's allegations of debilitating symptoms and limitations." R. at 20. The ALJ determined that Ms. Young has no past relevant work history because although she has worked as a hostess, her earnings do not rise to the level of substantial gainful activity. R. at 23. Because she had no past relevant work, the ALJ determined that transferability of job skills was not an issue. Id. Ms. Young was born on May 15, 1956, so the ALJ determined that she was classified as an individual of "advanced age" under 20 C.F.R. 404.1563. Id. The ALJ found Ms. Young has at least a high school education and is able to communicate in English. Id. The ALJ concluded that through the

date last insured, considering Ms. Young's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that she could have performed. Id. Thus, the ALJ concluded that Ms. Young was not under a "disability" as defined by the Act at any time from May 15, 2011, through June 30, 2015. R. at 24.

## Statement of Issues on Appeal

Issue No. 1.  Whether the ALJ erred in failing to exclude the report of Dr. Coulter for not mentioning certain complaints and past medical care.

Issue No. 2.  Whether the ALJ's determination of claimant's residual functional capacity is supported by substantial evidence.

## Analysis

### I. Standard of Review.

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005). Substantial evidence is more than "a mere scintilla," but less than a preponderance. Richardson v. Perales, 402 U.S. 389, 401 (1971); Hames v. Heckler, 707 F.2d 162, 164 (5th Cir. 1983). Alternatively, substantial evidence may be described as that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion. Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000). This court may not re-weigh the evidence, try the issues *de novo*, or substitute its judgment for the Commissioner's. Perez, 415 F.3d at 461.

The ALJ is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible. See Arkansas v. Oklahoma, 503 U.S. 91, 11360 (1992). Despite this Court's limited function, it must scrutinize the record in its entirety

to determine the reasonableness of the decision reached and whether substantial evidence exists to support it.  Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).  Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive.  Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995).

## II.      **Entitlement to Benefits under the Act.**

To be considered disabled under the Act, a claimant must establish that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Pursuant to the regulations promulgated under the Act, the Commissioner engages in a five-step sequential evaluation process to determine whether an individual qualifies as disabled. See 20 C.F.R. § 404.1520(a)(4). At each step, if the Commissioner determines that an individual is or is not disabled (depending on the step), her decision is made on that basis and she does not proceed to the next step. Id. Following these same five steps, the ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity (whether the claimant is working); (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals the severity of an impairment listed in 20 C.F.R., Part 404, Subpart B, Appendix 1; (4) whether the impairment prevents the claimant from doing past relevant work (whether the claimant can return to his old job); and (5) whether the impairment prevents the claimant from doing any other work.

Perez, 415 F.3d at 461. The burden of proof is on the claimant in Steps One through Four, and then at Step Five, the Commissioner must "show that the claimant can perform other substantial work in the national economy." Id. Once the Commissioner has made this showing, the claimant bears the burden to rebut the finding. Id.  An assessment of the claimant's residual functional

capacity is used in steps four and five to determine the claimant's ability to perform her past work or any other type of work. Id.

## I. **Plaintiff's Appeal**.

*Issue No. 1.* *Whether the ALJ erred in failing to exclude the report of Dr. Coulter for not mentioning certain complaints and past medical care.*

Ms. Young complains that Dr. Coulter's report should have been excluded. (Rec. Doc. 12-1, at 3). She cites 20 C.F.R. 404.1519p(a)(3). This regulation provides that when reviewing the report of a consultative examination (like Dr. Coulter's), the agency will consider:

> Whether the report is consistent with the other information available to us within the specialty of the examination requested; Whether the report fails to mention an important or relevant complaint within that specialty that is noted in other evidence in the file (e.g., your blindness in one eye, amputations, pain, alcoholism, depression);

20 C.F.R. § 404.1519p(a)(3). Ms. Young argues that Dr. Coulter's report is invalid because it does not mention her past shoulder and neck surgery or any diagnostic tests, nor does it mention any complaint other than fibromyalgia. (Rec. Doc. 12-1, at 2-3). Thus, she insists, the report must be excluded. Id. Ms. Young cites no case law to support her position that a consultative examiner's report must be excluded in its entirety for failing to mention a surgery.

As the Commissioner points out, Dr. Coulter noted Ms. Young's complaints of a history of back and shoulder pain and occasional numbness and tingling in her back and shoulder. R. at 203. Dr. Coulter also noted that Ms. Young reported back pain at an intensity level of five out of ten. Id. Dr. Coulter clearly "mentioned" Ms. Young's reports of back and shoulder pain. This is sufficient. This Court cannot conclude that Dr. Coulter failed to mention an "important or relevant complaint" sufficient to exclude the report simply because when he considered Ms. Young's complaints of back and shoulder pain, he did not consider her complaint of back and shoulder pain

*as a result of or despite a 2011 neck surgery and two 2004 shoulder surgeries.*[1] Accordingly, Ms. Young has not established that Dr. Coulter's report was invalid or that the ALJ erred by failing to exclude it.

Moreover, Ms. Young fails to demonstrate how she was prejudiced by the ALJ's consideration of a report by a consultative examiner who did not mention her past surgeries or "any diagnostic tests." Jones v. Astrue, 691 F.3d 730, 734–35 (5th Cir. 2012) ("The party seeking to overturn the Commissioner's decision has the burden to show that prejudice resulted from an error."). Dr. Coulter performed a battery of tests on Ms. Young and determined that all range of motion measurements were within normal limits, there were no Tinel's or Phalen's signs, and her Romberg exam was negative. R. at 205. He found no evidence of paravertebral muscle spasms or tenderness. Id. He tested her motor strength, muscle, bulk, and tone and found 5/5 upper extremity compared to lower extremity, right compared to left and 5/5 grip strength bilaterally. Id. He noted no weakness or atrophy. Id. He performed a sensory exam and reported "light touch and pinprick is intact throughout the upper and lower extremities." Id. Dr. Coulter observed that Ms. Young did not need assistance walking into the examination room, getting on or off the examination table, or taking on and off her shoes. R. at 204. No gait abnormalities were noted. R. at 205. It was based on these assessments and his observation of no objective limitations that Dr. Coulter found that Ms. Young's conditions would not impose any limitations. R. at 205-06. Ms. Young fails to show how this conclusion would have differed had Dr. Coulter mentioned her past surgeries in considering her back and shoulder pain.

---

[1] If the neck or shoulder surgeries are "important" or "relevant" complaints, it is unclear why Ms. Young failed to mention them to Dr. Coulter. His report indicates that Ms. Young informed him her chief complaint was "I'm applying for disability because it kills me to work one day a week." R. at 203. It appears that Ms. Young did not discuss her 2011 and 2004 neck and shoulder surgeries with Dr. Coulter.

Further, Ms. Young has not demonstrated that the ALJ's conclusions would have differed had Dr. Coulter's report been excluded in its entirety. After Ms. Young's neck surgery in late 2011, Dr. Patterson noted only "the usual postoperative neck discomfort." R. at 170. Left shoulder and lumbar spine x-rays were performed in August 2013 and showed no significant abnormalities. R. at 196, 199. There is no other objective evidence related to her neck or back. Her monthly visits to a pain clinic from January 2012 through April 2015 document her subjective reports of pain, not any objective testing or observation by the medical professionals at the clinic. Additionally, at these visits, Ms. Young consistently reported that her current medications were effective and generally reported that her pain was under control. If the ALJ had excluded Dr. Coulter's report, the remaining evidence does not suggest the ALJ might have come to a different conclusion regarding Ms. Young's residual functional capacity.

Additionally, as the Commissioner points out, Ms. Young's vague reference to Dr. Coulter's failure to mention "any diagnostic testing" is insufficient to establish any error or prejudice. As described above, Dr. Coulter himself performed diagnostic testing that assessed Ms. Young's condition at the time of her examination. Ms. Young does not indicate which tests should have been mentioned or considered by Dr. Coulter or how such tests could have led to different conclusions by Dr. Coulter or the ALJ. The Court is unable to identify any such tests.

Thus, even if Dr. Coulter's report was invalid because it did not mention her neck and shoulder injuries, this would not justify reversal because Ms. Young has not established any resulting prejudice.

*Issue No. 2.*     *Whether the ALJ's determination of claimant's residual functional capacity is supported by substantial evidence.*

In addition to the error alleged above, Ms. Young appears to complain that the ALJ's assessment of her residual functional capacity ("RFC") is not supported by substantial evidence.

(Rec. Doc. 12-1, at 4). Ms. Young's counsel suggests that no 100 pound woman could lift and carry 50 pounds for up to 1/3 of her work day. Id. at 2. Therefore, counsel argues, a person with limitations like Ms. Young, who has had two shoulder operations, a cervical spine fusion, and three years of monthly pain clinic visits, would certainly be unable to do so. Id. Counsel essentially argues that because a person of Ms. Young's age, education, and work history could only be found non-disabled (under the grids at 20 C.F.R. Pt. 404, Appendix 2) if she was found to have a residual functional capacity for medium work, the State Agency non-examining physicians "pretended that the evidence of Ms. Young's impairments didn't exist, in order to guide the claim to a denial." Id. at 2-3.

Ms. Young's complaint that "[t]he fix was in on this case from the start" is simply unsubstantiated. Id. at 2. Instead, the ALJ's RFC assessment is supported by substantial evidence. As discussed above, the ALJ properly considered Dr. Coulter's reports. Even if Dr. Coulter's ultimate conclusion is called into doubt because he did not consider the fact that Ms. Young had previously undergone neck and shoulder surgeries (an argument the Court rejects), there is nothing that calls into question his diagnostic testing that found, among other things, normal range of motion and bilateral strength in all extremities. R. at 205. The left shoulder and lumbar spine x-rays performed in August 2013 showed no significant abnormalities. R. at 196, 199. Dr. Saddler's report considered all of the medical records and concluded Ms. Young could engage in medium work. R. at 54-60. Dr. Culpepper agreed. R. at 68-70. The record indicates that Ms. Young last visited the Southern Bone & Joint Specialists for a December 2011 post-neck surgery examination, where Dr. Patterson reported Ms. Young was in a normal postoperative condition. R. at 170.

The only evidence besides her own testimony that could possibly militate in favor of Ms. Young's argument that she is unable to perform medium work as a result of her back and shoulder

pain is the history of monthly pain clinic visits starting in January 2012. But these records are not inconsistent with the ALJ's conclusions. Ms. Young regularly reported that her pain was stable and that the medications she was using were working. She never reported any marked difficulties with attention or concentration. Ms. Young's argument is based on her assertion that "we all know" that a cervical spine fusion is significant, that chronic orthopedic impairments "trouble aging bodies," and that long term use of strong medications affects the mental and physical abilities of the user. Id. at 5. What "we all know," does not amount to evidence. As discussed fully in the Standard of Review section, supra at 13-14, even where a different RFC assessment would be supported by the record, that is not sufficient to reverse the finding of the ALJ. "The court does not reweigh the evidence in the record, try the issues de novo, or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision." Newton v. Apfel, 209 F.3d 448, 452 (5th Cir. 2000).

This Court must reject Ms. Young's argument that the ALJ's decision is reversible as a matter of law because he found cervical disc disease and shoulder impairments to be "severe," but then found the objective medical evidence does not establish a cervical or shoulder condition that produces any chronic residuals. (Rec. Doc. 12-1, at 4). Ms. Young is correct that a severe impairment or combination of impairments "significantly limits an individual's ability to perform basic work activities" and that the ALJ found Ms. Young suffered from the following "severe" impairments: "a history of cervical disease with status post November 2011 cervical spine surgery" and "status post January and May 2004 left shoulder surgeries." However, this is not inconsistent with the ALJ's statement in the context of his RFC analysis that "[a]lthough the claimant does present with a history of such surgeries, the objective medical evidence establishes that neither

represents an impairment that produces any significant,[2] chronic residuals for the claimant . . . ." R. at 21. First, as the Commissioner points out, the determination of whether a claimant's impairments are severe at Step 2 is a low burden. At Step 2, an impairment is not severe "only if it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience." Shipley v. Sec'y of Health & Human Servs., 812 F.2d 934, 935 (5th Cir. 1987) (quoting Stone v. Heckler, 752 F.2d 1099, 1101 (5th Cir. 1985)). Importantly, a finding that a condition is severe at Step 2 (i.e., that the condition significantly limits the claimant's ability to perform basic work functions) is not the same as finding that the claimant is disabled (i.e., unable to engage in substantial gainful activity as a result of the condition). See id. Instead, it means that the ALJ must proceed to Step 3 of the analysis. Id. Thus, the ALJ's finding that Ms. Young's cervical spine and shoulder conditions were severe simply means that these conditions have more than a minimal effect on her ability to work. That finding is not inconsistent with the ALJ's determination that the objective medical evidence does not establish that her impairments produce "any significant, chronic residuals." While "significant, chronic residuals" are not defined, it is obvious this phrase refers to a condition that has a greater effect on a claimant's ability to work than that required to satisfy the definition of "severe" at Step 2.

Moreover, it is clear that the ALJ considered Ms. Young's cervical spine and shoulder impairments in assessing Ms. Young's RFC because the ALJ limited her to medium work and limited her use of ladders, ropes, scaffolds, ramps and stairs. By doing so, the ALJ incorporated his conclusions regarding the extent to which these impairments impacted Ms. Young's ability to work, consistent with his finding that the spine and shoulder impairments were "severe" in Step 2.

---

[2] Ms. Young's recitation of the ALJ's finding fails to include the word "significant."

See Boyd v. Apfel, 239 F.3d 698, 706 (5th Cir. 2001) ("The ALJ's finding that [claimant] had "a combination of impairments that is severe" did not foreclose a finding that [claimant] had a residual functional capacity to perform a range of light work, and is not necessarily inconsistent with that finding."). Further, because the ALJ included limitations in Ms. Young's RFC as a result of her spine and shoulder impairments, this Court cannot accept Ms. Young's suggestion that the ALJ's finding that there were no "significant, chronic residuals" is equivalent to a finding that the impairments had "no residual effect." Ms. Young cannot create an inconsistency by misquoting the ALJ and ignoring the limitations the ALJ incorporated into the RFC.

Finally, Ms. Young also argues that there is no basis to support the ALJ's adverse credibility determination on her testimony regarding side effects of the medication she is taking. Id. at 5. To the contrary, there is no basis to support her testimony. Ms. Young has not pointed to, and this Court has not found, even one medical record indicating any impairment of Ms. Young's mental state as a result of her medication or otherwise. The only mental health record is the report of consultative examiner Dr. Zakaras, who did not note any drowsiness or issues with concentration as claimed by Ms. Young at the hearing. Dr. Zakaras reported Ms. Young was oriented in all spheres and her thought processes were logical and goal oriented. R. at 209. Dr. Zakaras noted all of the medications that Ms. Young was taking, and nonetheless she found no psychological issues that would hinder Ms. Young from interacting with others, following and understanding directions, or performing routine tasks. R. at 209-10. Once again, Ms. Young's statement that "we all know" the effect of pain medication is insufficient to call the ALJ's decision into question.

The ALJ's RFC assessment is supported by substantial evidence and must be affirmed.

## RECOMMENDATION

Accordingly, IT IS RECOMMENDED that the Motion for Summary Judgment filed by the plaintiff (Rec. Doc. 12) be DENIED; and the Motion for Summary Judgment filed by the Commissioner (Rec. Doc. 13) be GRANTED.

## OBJECTIONS

A party's failure to file written objections to the proposed findings, conclusions and recommendations in a magistrate judge's report and recommendation within fourteen (14) calendar days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this 5th day of May, 2017.

Janis van Meerveld
United States Magistrate Judge